MONTIEL, Judge.
The appellant, General Flowers, was indicted for murder, in violation of § 13A-6-2, Code of Alabama 1975. The appellant was found guilty of the lesser included offense of criminally negligent homicide. He was sentenced to 12 months’ imprisonment in the county jail.
At trial, the state’s evidence tended to show the following. On March 16, 1991, the victim was shot to death while standing in front of Mundy’s Store, which is located on Highway 28 between Demopolis and Livingston, Alabama. Trial testimony indicated that the victim was killed by a shot fired from a passing automobile.
Several witnesses testified that at the time of the shooting a small gray Pontiac automobile passed Mundy’s Store and continued toward Livingston on Highway 28. Officer Bruce Walker of the Livingston Police Department testified that he received a radio dispatch regarding a small gray car traveling in the direction of Livingston. Walker stopped the car after he observed it speeding on Highway 28. The appellant, who is black, was driving and another black male was in the front passenger seat. Following a search of the ear, the appellant was allowed to leave because Officer Walker thought the police were looking for a car driven by white males.
Further trial testimony tended to show that a Sumter County deputy sheriff found a spent 9 mm cartridge on the road in front of Mundy’s Store. Later, it was determined that the victim had been killed by a bullet fired from a 9-mm pistol.
The appellant, who resided in Dothan, Alabama, originally gave a statement to the Houston County Sheriffs Department denying that he had ever owned a 9-mm pistol. After further investigation revealed that the appellant had indeed purchased a 9-mm pistol prior to the killing, the appellant admitted that he had owned a 9-mm pistol but stated that it had been stolen before the victim’s death.
I
The appellant contends that the trial court erred in denying his motion for a new trial on the basis of newly discovered evidence. The appellant’s contention is without merit.
The appellant was sentenced on March 5, 1992. On March 11, 1992, the appellant filed a motion for new trial. Over a month later, on April 15, 1992, the appellant filed an amended motion for new trial, alleging for the first time that he had newly discovered evidence that would indicate that he could not have committed the offense.
The hearing on the appellant’s motion for a new trial was held on June 4, 1992. In support of his motion, the appellant offered the testimony of Genzill Dykes. Dykes testi *1079 fied that the victim had been related to her husband and that she had known the victim “for years.” Testimony at the hearing revealed that, on the day of the trial, after the case had gone to the jury, Dykes told the appellant’s attorney that the appellant could not have shot the victim. Dykes testified that she was following the appellant’s car when it went by Mundy’s Store. She stated that she stopped at the store and learned that the victim had been shot. She testified that she saw no shots fired from the appellant’s automobile.
At the hearing, the appellant’s attorney told the court that Dykes had come to him with this information while the jury was deliberating. The appellant’s attorney indicated that he got Dykes’s name, but could not locate her until sometime later.
This court has held that:
“To establish a right to a new trial based on newly discovered evidence, the movant must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; (5) that it is not merely cumulative or impeaching.”
Marks v. State, 575 So.2d 611, 616 (Ala.Crim.App.1990).
In this case, it was not shown that the evidence had been discovered since the trial. In fact, Genzill Dykes testified that she sat in the courtroom during the trial in an effort to show support for the victim’s family. She stated that she realized that during the appellant’s trial that the appellant was innocent and that during jury deliberations, approached the appellant’s attorney with the information the appellant alleges is newly discovered. At the hearing, the appellant’s attorney admitted that he learned this information “on the day of the trial after the case had been given to the jury.” (R. 285.) We find that the trial court did not err in denying the appellant’s motion for new trial based upon the discovery of new evidence.
II
The appellant contends that the trial court erred in denying his motion to exclude a statement he had made to police, which the state failed to provide to him until the morning of trial even though he alleges that he had filed a discovery motion requesting such statements. The appellant’s contention is without merit.
On the day of the trial and following the voir dire of the venire, the following exchange took place:
“MR. PERRY [Appellant’s Counsel]: The other objection is this morning I was presented with a statement given by my client on March 22, 1991, to Investigator Vann. Up until this morning I have never seen the statement of my client or the co-defendant. I would object to the use of anything in the statement. I have not seen it prior to this morning, the date of trial. I filed a motion for discovery, and the District Attorney — I don’t believe it’s intentional because he’s been cooperative but all the same, I never had the benefit of seeing the statement of my client.
“THE COURT: Why is that?
“MR. WATKINS [District Attorney]: It’s been with the Sheriffs office, and I didn’t know it.
“THE COURT: Well, we’ll have to try something else and try this at the-end of the week. He has a right to do that.
“MR. WATKINS: Your Honor, I think he was aware of it. He had a lawyer with him.
“MR. PERRY: I understood there was a statement. I did not know it was recorded and there was a transcript of it.
“THE COURT: He had an attorney present?
“MR. WATKINS: Yes.
“THE COURT: The defendant had an attorney present with him at the time it was made?
“MR. PERRY: He did.
“THE COURT: Surely you have been in touch with that attorney.
“MR. PERRY: Yes, your honor.
*1080 “THE COURT: You knew he made a statement?
“MR. PERRY: I did not know it was recorded, but I knew he made a statement.
“MR. WATKINS: I’m the one that didn’t know about it.
“THE COURT: Y’all all knew a statement was made?
“MR. WATKINS: I knew it today.
“THE COURT: You didn’t know it was a recorded statement until today?
“MR. WATKINS: I didn’t even know a statement was made to my knowledge.
“THE COURT: Is this a confession?
“MR. WATKINS: No, sir. But it is a statement that will put him there shooting at a sign. It’s a declaration against interest.
“THE COURT: A declaration against interest in some regard. I don’t see how you’re surprised at this time because, I mean, you were aware there was a statement. Are you aware what was said?
“MR. PERRY: Generally. There was one part that was a surprise and I think will be detrimental to my client.
“THE COURT: Are you asking today for hours to discuss it or are you asking for a continuance?
“MR. PERRY: I’m asking to proceed to trial and to exclude the statement.
“THE COURT: The most remedy I would give you would be some time to evaluate it, but it would not be excluded absent any prosecutorial misconduct. And I don’t see how there could be since he was represented at the time.
“MR. PERRY: I’m not requesting time. I don’t think time would be of any benefit. I was requesting the statement be excluded.
“THE COURT: Overrule the motion.”
(R. 2-5.)
Rule 16.1, A.R.Crim.P. provides:
“(a) Upon written request of the defendant, the prosecutor shall, within fourteen (14) days after the request has been filed in court as required by Rule 16.4(c), or within such shorter or longer period as may be ordered by the court, on motion, for good cause shown:
“(1) Permit the defendant to inspect and to copy any written or recorded statements made by the defendant to any law enforcement officer, official, or employee which are within the possession, custody, or control of the state/municipality, the existence of which is known to the prosecutor....”
In this case, the district attorney stated to the court that he was not aware of the statement before the morning of trial. There is no evidence to the contrary. Furthermore, the trial court offered the appellant additional time in which to evaluate the statement and its impact. The trial court properly overruled the appellant’s motion to exclude the statement.
Ill
The appellant contends that the trial court erred in permitting the state to impeach its own witness. This contention is without merit.
During the trial of this case, the state called Timothy Reynolds, a friend of the appellant, as a witness. Prior to trial, Reynolds had given a statement to Investigator Eddie Ingram regarding the appellant’s claim that the appellant’s 9-mm pistol had been stolen from his car in November 1990, before the victim was killed. On direct examination, Reynolds apparently gave testimony that differed from the statement he had previously given Investigator Ingram. Pertinent portions of that exchange went as follows:
“Q. [By the prosecutor] So, Mr. Reynolds, you’re telling us that the last time you did see it, then, is in your car the night it was broken into? Is that what you’re telling us?
“A. [Reynolds] Sir?
“Q. Are you saying you saw that 9-mm pistol in your car the night your car was broken into?
“A. I say around November of ’90 is the last time I saw the gun. Around November of ’90.
“Q. November of ’90. Is that when your car was broken into?
“A. Yes, it was.
*1081 “Q. Did you see it in your car the night it was broken into?
“A. Yes, sir.
“Q. Did you see it after that?
“A. No, sir.
“Q. Did you report the gun stolen or did anybody report it stolen?
“A. No, sir.
“Q. What was stolen besides the gun? “A. A jacket.
“Q. Whose jacket was it?
“A. Mr. Flowers.
“Q. Now, you’re saying to us now that the 9-mm [gun] was in the ear at the time the car was broken into?
“A. Yes, sir.
“Q. Do you recall giving a statement that you agree you did give to Mr. Ingram—
“MR. PERRY: Your Honor, objection. He’s impeaching his own witness.
“THE COURT: Overrule.
“Q. Do you recall giving that statement to Mr. Ingram?
“A. What’s that, sir?
“Q. Do you recall giving a statement to Mr. Ingram that was taped?
“A. Yes, sir.
“Q. Do you recall telling him that the gun was not in the car?
“A. I said that after he had harassed me.
“Q. Oh, he harassed you?
“A. Yes.
“Q. And so you said it wasn’t in the car?
“A. I told him I didn’t want to be involved.
“Q. You told him that on tape?
“A. No, sir. He had turn the tape off.
“Q. Did you have a conversation with General Flowers about the 9-mm gun?
“A. Yes, sir.
“Q. What was that conversation, and when was it?
“A. The conversation was prior to his arrest. He came to my house early one morning and he said he had to go talk to his lawyer. But first he wanted to know did I remember what happened that night. I say, Yeah.’ He say, ‘They trying to say I have a 9-mm.’ I say, ‘It’s not possible’ because I haven’t seen one since then.
“Q. So, that’s the extent of the conversation?
“A. No, sir.
“Q. Go on and tell us about the conversation.
“A. I said the only one I’ve seen you with at anytime since was the .25.
“Q. Did Mr. Ingram ask you: ‘Did General Flowers ask you to tell us that the 9-mm was in that car?’
“A. Did Mr. Ingram ask me that?
“Q. What did you tell him?
“A. I told him I didn’t want to be involved. He said, ‘You’re lying, you’re lying, you’re lying.’ Maybe after he shook me up, I don’t know what I said.
“Q. Now, you say you don’t know what you said. Do you recall yesterday going over this statement and telling me it was correct?
“A. I told you parts of it were correct.
“Q. Do you recall at the end of our conversation you said, “The statement I gave Mr. Ingram I have reviewed. I don’t need to review it again, and it is correct?” In front of Mr. Ingram and Mr. Yann.
“A. Parts of it are correct.
“Q. So, you’re saying you didn’t say that?
“A. No. I didn’t say that.
“Q. What did you say now?
“A. I said parts of the statement are correct and parts are not.
“Q. You said that before you left. That was the last thing you told us.
“A. That’s right.
“MR. WATKINS: Your Honor, I at this point would like to ask the Court to call him as a Court’s witness, and I claim surprise. I will say unto the Court he told me as recently as yesterday afternoon late that he had gone through this statement and that the statement was correct. Now he has varied from- the statement. And I can show unto the Court the variance.
“MR. PERRY: Object to that, Your Honor. He’s trying to impeach his own *1082 witness. He obviously knew yesterday there was a problem. He’s trying to turn the thing. He’s impeaching his own witness, and it’s totally improper.
“THE COURT: I’m going to sustain.” (R. 139-143.)
Throughout the state’s direct examination of Reynolds, the court continued to rule in the appellant’s favor on the issue of impeachment. Later, however, the state recalled Investigator Ingram and questioned him regarding the statement that Reynolds had made to him prior to trial. The appellant again objected on the grounds that the state was impeaching Reynolds, its own witness. The Court, nevertheless, allowed the state to examine Ingram regarding the statement. (R. 166.)
This court has held that:
“[I]f a witness’ testimony about a matter is adverse to the party who called the witness, it is proper for the trial court to permit such party, either for the purpose of proving such party’s surprise at such testimony or for the purpose of refreshing the recollection of the witness and thereby inducing the witness to change such testimony, to require of the witness whether he had previously made, and to elicit testimony from him that he has previously made, a specified statement about the matter different from his present testimony and of a tenor favorable to such calling party.”
Futral v. State, 558 So.2d 991, 993 (Ala.Crim.App.1989). Futral further held that “[bjased on the theory of surprise, the State may not only elicit from a witness the fact that he had made a prior statement but may also elicit the contents of the statement.” Futral, at 993. Contrary to the appellant’s claims, we find no evidence that the state was aware that the witness, Reynolds, would offer trial testimony that would conflict with his prior statement to Investigator Ingram. The state was correct in claiming surprise. The trial court properly permitted Investigator Ingram to testify as to the statement and should have allowed, under the theory of surprise, as noted in Futral, the state to question Reynolds regarding his previous statement.
The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur.